IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CA. NO.: 1:11-CV-115

| | | |
|---|---|---|
| Synovus Bank, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Jana M. Osada, | ) | |
| | ) | |
| Defendant. | ) | **2ⁿᵈ AMENDED ANSWER/COUNTERCLAIM** |
| v. | ) | **AND THIRD PARTY** |
| | ) | **COMPLAINT** |
| Synovus Financial Corp. d/b/a | ) | |
| National Bank of South Carolina; | ) | |
| Synovus Financial Corp.; Keith | ) | |
| Vinson, individually; Keith Vinson | ) | **(JURY TRIAL DEMANDED)** |
| d/b/a Seven Falls, LLC; Seven Falls | ) | |
| Real Estate, LLC; Seven Falls Realty, | ) | |
| LLC; Seven Falls Golf Club, LLC; | ) | |
| Seven Falls Golf & River Club, LLC; | ) | |
| Seven Falls Club Amenities, LLC; | ) | |
| Seven Falls Lodging, LLC; Seven Falls | ) | |
| Ventures, LLC; Seven Falls Property | ) | |
| Owners Association, Inc.; Mountain | ) | |
| Development Company, LLC; and | ) | |
| Zeus Investments, LLC; Seven Falls | ) | |
| LLC; Seven Falls Golf Club, LLC; | ) | |
| Seven Falls Golf & River Club, LLC; | ) | |
| Seven Falls Club Amenities, LLC; | ) | |
| Seven Falls Lodging, LLC; Seven Falls | ) | |
| Ventures, LLC; Seven Falls Property | ) | |
| Owners Association, Inc.; Mountain | ) | |
| Development Company, LLC; and | ) | |
| Zeus Investments, LLC | ) | |
| | ) | |
| Third Party | ) | |
| Defendants. | ) | |

COMES NOW THE Defendant by and through her attorney of record in answer to the Complaint filed herein and state and say:

1.      Paragraph 1 is admitted.

2.     Paragraph 2 is admitted with respect to the matters asserted related to citizenship.

3.     Paragraph 3 is a legal conclusion for which no response is required. Responding further, Defendant does not object to the jurisdiction of this Court.

4.     Paragraph 4 is a legal conclusion for which no response is required. Responding further, Defendant does not object to the jurisdiction of this Court.

5.     It is specifically pled that the Defendant was enticed by aggressive marketing tactics to purchase property from the Plaintiff and the Third Party Defendants named herein; the remainder of Paragraph 5 is admitted.

6.     Inasmuch as Defendant has the legal right to see all alleged original documentation claimed by the Plaintiff in this case, Paragraph 6 is denied.

7.     Inasmuch as Defendant has the legal right to see all alleged original documentation claimed by the Plaintiff in this case, Paragraph 7 is denied.

8.     Inasmuch as Defendant has the legal right to see all alleged original documentation claimed by the Plaintiff in this case, Paragraph 8 is denied.

9.     Inasmuch as this Defendant has the legal right to see all alleged original documentation claimed by the Plaintiff in this case, Paragraph 9 is denied.

10.     Inasmuch as Defendant has the legal right to see all alleged original documentation claimed by the Plaintiff in this case, Paragraph 10 is denied.

11.     Inasmuch as Defendant has the legal right to see all alleged original documentation claimed by the Plaintiff in this case, Paragraph 11 is denied.

12.     Inasmuch as Defendant has the legal right to see all alleged original documentation claimed by the Plaintiff in this case, Paragraph 12 is denied.

13.     Inasmuch as Defendant has the legal right to see all alleged original

documentation claimed by the Plaintiff in this case, Paragraph 13 is denied.

14.    It is unknown to Defendant what the Plaintiff claims with respect to the alleged "balance" of the note and as such Paragraph 14 is denied.

15.    Paragraph 15 is denied.

16.    Paragraph 16 is denied.

17.    Inasmuch as Defendant has the legal right to see all alleged original documentation claimed by the Plaintiff in this case, Paragraph 17 is denied.

18.    Paragraph 18 is denied.

## FIRST FURTHER DEFENSE

19. As a further defense to the claims asserted herein, the Defendant asserts that the Plaintiff enjoyed a specially close joint venture relationship with the Developer of the project known as Seven Falls. That this relationship entailed an opportunity to view not only the viability of the proposed project but also the strength of the Developer to actually complete the project. That the Plaintiff in this case had an obligation of good and fair dealing which thus imposed a duty on the Plaintiff to disclose material facts that the alleged guarantors in this case were unlikely to discover otherwise. That the failure of the bank to disclose these material facts caused and continues to cause irreparable damage to the Defendant named herein and is a defense to Plaintiff's action herein.

## SECOND FURTHER DEFENSE

20. As a further defense to the claims asserted herein, the Defendant asserts that the Plaintiff represented to the Defendant that the Plaintiff and the Developer were engaged in a joint venture with respect to the development of Seven Falls for the purpose of inducing the Defendant to borrow funds for a purchase money loan to

buy a lot at Seven Falls that would be secured by the real estate; that the Defendant reasonably relied on these representations and obtained a purchase money loan from the bank and turn granted a deed of trust to the bank to secure the loan; that the Plaintiffs then used to loan purchase the real property under a contract that listed the Developer as the seller; that the Defendant suffered great financial harm when the Developer failed to complete Seven Falls and were unable to make timely payments on their loan. Under these circumstances, the Plaintiff is equitably estopped from denying that the Plaintiff and the Developer were joint venture partners in the sale of lots at Seven Falls and is equitably estopped from denying that the Plaintiff is a seller, or a constructive seller, of the lots within the deficiency judgment statute. The Defendant raises the North Carolina anti- deficiency judgment statute as a complete defense to this action.

### THIRD FURTHER DEFENSE

21.  Defendant asserts that Plaintiff should be equitably estopped from seeking any and all relief for damages related to the promissory note at issue in this litigation due to the wrongful conduct of Plaintiff as discussed herein.

### FOURTH FURTHER DEFENSE

22.  Defendant incorporates every claim, demand, right or otherwise which is referenced in the Counterclaim and Third Party Claim alleged herein.

### FIFTH FURTHER DEFENSE

23. Plaintiff in this action is barred from recovery by the illegality of the transaction and nullification of any obligation of Defendant to Plaintiff.

### SIXTH FURTHER DEFENSE

4

24. Plaintiff's claims are barred to the extent any personal guaranty from Defendant lacks consideration.

## SEVENTH FURTHER DEFENSE

25. Plaintiff's claims against Defendant individually are barred to the extent Defendant did not personally guaranty the loan obligation.

## EIGHTH FURTHER DEFENSE

26. Plaintiff's claims against Defendant are barred by the anti-deficiency judgment statute in North Carolina – N.C.G.S. §45-21.38. As a joint venturer with the Developer Plaintiff was a constructive owner/seller of the real estate and accordingly is hereby barred from seeking a deficiency judgment against the Defendant in accordance with the anti-deficiency statute for the State of North Carolina.

## NINTH FURTHER DEFENSE

27. Plaintiff's claims against Defendant are barred by Plaintiff's failure to properly mitigate its damages.

## TENTH FURTHER DEFENSE

28. That a principal-relationship existed between the Plaintiff and the Developer; that the Developer executed the sales contracts on his own behalf but also as agent for the Plaintiff, which was a disclosed or partially disclosed principal with respect to the sale of the lots;

29. That the Plaintiff was therefore both the seller of the real estate and the lender of the purchase money

30. The Defendant raises the North Carolina anti- deficiency judgment statute as a complete defense to this action.

## ELEVENTH FURTHER DEFENSE

31. That, as a result of the representations made by the Plaintiff to each Defendant, each Defendant reasonably believed that the Developer was the agent of the bank with respect to the sale of lots in Seven Falls and reasonably relied on these representations both in borrowing purchase money for their lots and in purchasing their lots.

32. That an apparent principal-agent relationship existed between the Plaintiff and the Developer; that the Developer executed the sales contracts on his own behalf but also as apparent agent with apparent authority for the Plaintiff, which was a disclosed or partially disclosed principal with respect to the sale of the lots;

33. That the Plaintiff was therefore both the seller of the real estate and the lender of the purchase money

34. The Defendant raises the North Carolina anti- deficiency judgment statute as a complete defense to this action.

## COUNTERCLAIMS/THIRD PARTY CLAIMS

COMES NOW, the Defendant by way of Counterclaims against the Plaintiff and by way of Third Party Complaint against those named herein as Third Party Defendants (hereinafter Plaintiff, Synovus Financial Corp., and NBSC collectively referred to alternatively as "NBSC" and/or "Bank Defendants"; Seven Falls, LLC, Keith Vinson, and all other Seven Falls related entities referred to as "Developer" and/or "non-Bank Defendants")) and states and says:

### INTRODUCTION

1. "Seven Falls Golf and River Club" (hereinafter referred to as "Seven Falls") was supposed to be a beautiful, private, mountain golf community in Henderson County,

6

North Carolina, but it was never developed. The Defendant in this action is part of a large group of defrauded purchasers who were fraudulently induced into investing in Seven Falls and have commenced this action in an attempt to recover their damages.

2.    Upon information and belief:

    a.   Plaintiff and Third Party Defendants together jointly marketed and orchestrated approximately Fifty Million Dollars ($50,000,000.00) in residential lot sales at a private mountain subdivision that was represented to include hard surface roads, electric service, and telephone lines to each lot; an Arnold Palmer signature 18 hole golf course; a golf clubhouse, post office, chapel, café bakery, pub, tennis courts, wine store, wellness center, bike shop, family activities center, river outfitter store, boat house and dock, river lodge, river campsite, and an amphitheater;

    b.   Plaintiff and Third Party Defendants failed to build any roads, set up any electric service, or run even the first telephone line to any lot;

    c.   Third-Party Defendant failed to build any 18-hole golf course, much less an Arnold Palmer course, and failed to build any of the other facilities identified above;

    d.   NBSC reaped the benefit of these sales by directly profiting or by virtue of an increased stock price;

    e.   NBSC failed to follow its own lending procedures in these sales and consequently caused a financial disaster for those investing in Seven Falls;

    f.   Proceeds from Seven Falls lot sales were misappropriated by NBSC and Developer;

g. NBSC executives took lavish trips with Developer on private jet aircraft purchased with funds intended for the development of Seven Falls;

h. Plaintiff and Third Party Defendants concealed information during the marketing and sale of lots at Seven Falls regarding these expenditures and the overall financial state of Seven Falls and the Developer;

i. NBSC publicly recorded funding of Ninety-Million Dollars ($90,000,000.00) for the development of Seven Falls;

j. NBSC prematurely cancelled approximately Sixty-Three Million Dollars ($63,000,000.00) in publicly-recorded financial commitments to Seven Falls and prematurely declared a loss on the Seven Falls development because: 1) it never intended to fully fund the development due to its focus on short term earnings; 2) the focus on short-term earnings was based on the Bank's belief that a third-party lender would refinance the Defendants lot purchases; and 3) because the Bank had the ability to obtain federal government benefits under the TARP program.

k. Plaintiff and Third Party Defendants were responsible for ordering and paying for improperly-inflated appraisals of lots purchased at Seven Falls;

m. NBSC engaged in overly-aggressive lending practices at Seven Falls;

n. NBSC failed to perform proper due diligence to determine whether Developer was experienced, properly capitalized and competent;

o. NBSC failed to properly supervise and oversee the Developer or its employees and agents despite having some measure to direct the conduct of the Developer;

p. NBSC violated its fiduciary duties to Defendant;

8

q. A joint venture or partnership existed between NBSC and the
Developer;

r. Third Party Defendants have engaged in the schemes described herein to
improperly and unlawfully sell property within Seven Falls development at
improperly inflated value and whether Plaintiff is vicariously liable for these
torts.

### Parties, Jurisdiction, Venue

3. Defendant is an individual who resides in North Carolina.

4. Plaintiff Synovus Bank ("Synovus Bank") is a public Georgia corporation
that does business under many names, including the National Bank of South Carolina
("NBSC") and Synovus Financial Corp. Synovus Bank is headquartered in Columbus,
Georgia. NBSC was a domestic corporation in South Carolina but merged into Synovus
Bank. Because of this relationship, when NBSC is referred to throughout this document,
such reference is also to include Synovus Bank and Synovus Financial Corp. Synovus Bank
and NBSC are subject to the personal jurisdiction of the Court.

5. Third-Party Defendant Keith Vinson is an individual who was the principal
in multiple companies purportedly formed for the purpose of developing Seven Falls. These
companies are essentially the alter-ego of Vinson but have the designations: Seven Falls,
LLC; Seven Falls Real Estate, LLC Seven Falls Realty, LLC; Seven Falls Golf Club, LLC;
Seven Falls Golf & River Club, LLC; Seven Falls Club Amenities, LLC; Seven Falls Lodging,
LLC; Seven Falls Ventures, LLC; Seven Falls Property Owners Association, Inc.; Mountain
Development Company, LLC; and Zeus Investments, LLC. Each of these entities was
loaned money by NBSC as part of the Seven Falls development. Keith Vinson and these
companies are referred to herein collectively as "Developer." Developer has done and

continues to do substantial business in North Carolina and is subject to the jurisdiction of the Court. Developer Defendants are proper Third-Party Defendants as Defendants claims against Developer are dependent upon the extent to which, if at all, Defendant is liable to Plaintiff. Specifically, the amount of damages Defendant is entitled to from Developer and/or Plaintiff for failure to construct the amenities and infrastructure at Seven Falls is dependent on the extent of the joint venture relationship and the money, if any, Defendant must pay to Plaintiff on the promissory notes.

6. Jurisdiction is also proper pursuant to 15 U.S.C. § 1719 of the Interstate Land Sales Act.

**Factual Background**

7. Seven Falls is the name of a residential community that was supposed to be located in Henderson County, North Carolina. It originally consisted of approximately 1,600 acres of undeveloped land and is a "Subdivision" as that term is defined by the Interstate Land Sales Act ("ILSA") 15 U.S.C. § 1701 et. seq. Each Plaintiff purchased a lot(s) at Seven Falls and such lots are not exempt from ILSA as provided for in 15 U.S.C. § 1702.

8. From 2006 to 2008, NBSC and Developer together jointly marketed and orchestrated approximately Fifty Million Dollars ($50,000,000.00) in residential lot sales at a private mountain subdivision that was represented to include hard surface roads, electric service, and telephone lines to each lot; an Arnold Palmer signature 18 hole golf course; a golf clubhouse, post office, chapel, café bakery, pub, tennis courts, wine store, wellness center, bike shop, family activities center, river outfitter store, boat house and dock, river lodge, river campsite, and an amphitheater. Upon information and belief, NBSC made profits on the sale of some lots. Specifically, NBSC and the Developer shared profits on at

least the following transactions: 1) on or about August 29, 2007, NBSC was paid $257,202.00 of the $450,000.00 cash paid by John T. Keating for lot 108; on or about October 5, 2007, NBSC was paid $146,676.00 of the $270,000.00 cash paid by Gerald J. Maier for lot 104; on or about January 10, 2008, NBSC was paid $134,115.44 of the $335,000.00 paid from Greenville First Bank for the lot purchase by Barry D. Breede; on or about August 29, 2008, NBSC was paid $320,328.80 as part of the $448,000.00 lot purchase by Bob Burns; on or about September 19, 2007, NBSC was paid $187,579.84 as part of the $450,000.00 lot purchase by Ken Costanzo; on or about January 3, 2008, NBSC was paid $264,040.00 as part of the $495,000.00 lot purchase by Randy Garvey; on or about August 31, 2007, NBSC was paid $139,999.20 as part of the $260,000.00 lot purchase by Robert Gilliand; on or about July 22, 2008, NBSC was paid $368,907.60 as part of the $637,500.00 lot purchase by Andrew Hager; on or about August 18, 2008, NBSC was paid $147,773.60 as part of the $275,000.00 lot purchase by Steve Lucas; on or about August 31, 2007, NBSC was paid $150,707.84 as part of the $277,500.00 lot purchase by Jay Lurie and Charles Kimmell; on or about December 10, 2007, NBSC was paid $256,385.20 of the $450,000.00 lot purchase by Ronnie and Sherri Martin; on or about September 12, 2007, NBSC was paid $133,865.20 of the $250,000.00 lot purchase by Judson Maurer; on or about December 18, 2007, NBSC was paid $127,285.60 as part of the $230,000.00 lot purchase by Christopher McDonough; on or about September 5, 2007, NBSC was paid $103,113.60 as part of the $200,000.00 lot purchase by Steve Mitchell and Dawn Dietrich; on or about September 7, 2007, NBSC was paid $225,900.80 as part of the $400,000.00 lot purchase by Thomas Morgan; on or about September 18, 2007, NBSC was paid $203,741.88 as part of the $364,000.00 lot purchase made by Bill and Robbie Paine; on or about May 30, 2008, NBSC was paid $215,819.55 on the $671,250 in three lot purchases by Kostas and Emily Rantzos; on or about September

12, 2007, NBSC was paid $158,252.08 as part of the $289,000.00 lot purchase by Bill Stokes; and on or about September 18, 2007, NBSC was paid $216,844.20 as part of the $385,000.00 lot purchase by Steven Wallace. All total, the bank took proceeds of $3,472,674.13 from sales of lots at 7 Falls.

9.      Despite the transfer of millions of dollars; Plaintiff and Third Party Defendants' legal duty; and the multiple promises, representations and agreements obligating Developer and NBSC to construct the infrastructure and amenities at Seven Falls, little or no development has taken place. Specifically, Plaintiff and Third Party Defendants have failed to build any roads; install any electric service, telephone service, or other utilities; build any golf course (much less an Arnold Palmer signature course); or build any of the aforementioned facilities. Instead, millions of dollars has been wasted or misappropriated as articulated herein and the Seven Falls development is at a virtual standstill. Defendant cannot even drive a vehicle to his property, much less apply for construction permits to build a home. As a result, the property value of each lot purchased by the Defendant is grossly below the value promised by NBSC and the Developer and grossly below the original appraisal value used by NBSC. This appraisal value was improperly high because it failed to take into account the "creative financing" that was used by NBSC on the comparable lot transactions used in Seven Falls. Upon information and belief, NBSC knew that this would lead to improperly high appraisals but persisted in the use of these appraisals because of the Bank's focus on short term profits, as further described below.

10.      NBSC and the Developer were intricately intertwined in the development, marketing, financing, and sale of lots at Seven Falls and intentionally associated themselves to engage in and carry out a business venture for joint profit (as essentially co-owners), for which purpose they combined their efforts, property, money, skill, and knowledge. As joint-

venturers or partners, NBSC and the Developer are each jointly and severally liable for the unlawful acts of the other.

11. The acts pursuant to this joint venture include, but are not limited to, upon information and belief:

    a. loans to Developer of Ninety Million Dollars ($90,000,000.00) for development of Seven Falls;

    b. shared ownership of bank accounts with Developer;

    c. joint promotion of NBSC as the primary or preferred lender on NBSC/Seven Falls joint letterhead with no disclaimers or provisions which would indicate any separation between NBSC and the Developer to investors;

    d. NBSC's issuance of an irrevocable standby letter of credit, insuring that much of the infrastructure and golf course would be completed;

    e. a joint elaborate and expensive marketing plan (more specifically described below) under which NBSC solicited investors and lent its name and prestige to the sales efforts, assuring prospective lot owners at Seven Falls that it was backing the development;

    f. funneling investors, including Defendant, through the lending process of NBSC for the purpose of maximizing the fees, commissions, and interest paid by Defendant;

    g. the solicitation and acceptance of appraisals which grossly overvalued the lots sold to the Defendant at Seven Falls and valued such lots as though development of Seven Falls, including its promised amenities, was complete;

    h. shared profits upon information and belief;

    i. shared responsibility for development.

j.   NBSC's issuance of deeds of trust far in excess of the amount actually loaned on the project, thereby taking a constructive ownership interest in the project; and

k.   NBSC's control of the money disbursed to Developer and thereby control of the implementation of the project.

12.   As part of their aggressive marketing scheme, in or about May 2007, NBSC and the Developer hosted an event at the Biltmore Estate in Buncombe County, North Carolina for the original lot owners of Seven Falls, also known as Founding Members.  The purpose of this event was to determine the lot location of the Founding Members' lots.  This event featured free food, free alcoholic and non-alcoholic drinks, and free entertainment, which included live music, ice carvings, and an appearance by golf legend Arnold Palmer, who flew into the party by helicopter.  At that event, employees of NBSC and the Developer announced the plans for Seven Falls, dates of completion, and conveyed to all attendees that Seven Falls was financially secure.

13.   On or about this time, Developer produced a series of DVDs updating lot owners of the progress at Seven Falls and marketing Seven Falls to consumers. These DVDs conveyed the message that no expense would be spared in the development of Seven Falls. NBSC provided financing for this DVD series and numerous other marketing efforts by the Developer.  Despite the representations in these DVD's, little or no construction was ever done at Seven Falls.

14.   On or about June 9, 2007, NBSC and the Developer hosted the Grand Opening of Seven Falls on the grounds of Seven Falls in order to coax consumers into purchasing lots at Seven Falls.  This event featured free food, free alcoholic and non-alcoholic drinks, and free entertainment, which included kayaking demonstration and

14

instruction, guided natural hikes, fly fishing demonstration and instruction, bird house painting, wine tastings, massage services, hot air balloon rides, helicopter rides, canoe rides, face painting, autographs by Arnold Palmer, music, climbing wall, Native American and bluegrass music, and wildlife exhibits. This event also featured a site model and flat screen televisions showing what Seven Falls would look like upon completion.

15.     NBSC's strong presence at the Grand Opening event was in effort to show its financial support and backing of Seven Falls and to convince consumers of the financial viability of Seven Falls.

16.     On or about the evening of June 9, 2007, NBSC and the Developer hosted a private concert for Seven Falls lot owners at the Biltmore Estate in Buncombe County, North Carolina, featuring The Blues Brothers in order to lure consumers into purchasing lots at Seven Falls. After the concert ended, every Founding Member was given backstage access and the opportunity to get a private picture with The Blues Brothers. These extravagant marketing tactics were used by NBSC and the Developer to persuade consumers into believing Seven Falls was fully funded by NBSC and financially stable.

17.     On or about July 2, 2007, NBSC executed an "irrevocable standby letter of credit" in the amount of $6,333,347.00, which purported to ensure the completion of much of the infrastructure in Seven Falls and the golf course. The letter had no disclaimers or provisions which would indicate any separation between NBSC and the Developer to investors.

18.     As part of their aggressive marketing scheme, in or about October of 2007, NBSC and the Developer hosted a fall festival at Seven Falls in order to coax consumers into purchasing lots at Seven Falls and to assure current lot owners of the development progress at Seven Falls. This event featured free food, free alcoholic and non-alcoholic

drinks, and free entertainment, which included games for children and pumpkin carvings.

19.     In or about February 2008 the Developer took officers of NBSC on a vacation ski trip to Beaver Creek, Colorado on a Gulfstream private jet.  Developer purchased this Gulfstream jet approximately 26 days after NBSC transferred Developer Twenty Million Dollars ($20,000,000.00) intended for the development of Seven Falls.  The jet was named "first draw."   Following the ski trip, on or about February 3, 2008, the Developer flew NBSC officers on this same jet to Phoenix, Arizona to watch Super Bowl XLII.  These officers enjoyed lavish accommodations during their stay in Phoenix with funds provided by Developer.  This was during the time when NBSC was obligated by bond to complete the roads, bridges, and utilities at Seven Falls.  NBSC executives failed to take this action, or exercise a bond to take the action.

20.     On or about June 7, 2008, NBSC and the Developer hosted the Grand Opening of the Arnold Palmer Golf Academy at Seven Falls.  Neither NBSC nor the Developer explained to consumers who attended the event that the Golf Academy would not be owned by investors in Seven Falls, but by Zeus Investments, LLC; an entity in which the Developer is a partner.  This event was intended to promote the sale of the exclusive Villas at Palmer Place and to assure current lot owners of the development progress at Seven Falls.  This event featured free food, free alcoholic and non-alcoholic drinks, and free entertainment, which included appearances by Arnold Palmer and saxophone legend Kenneth Bruce Gorelick ("Kenny G"), ice carvings, kayaking, helicopter rides, rock climbing and fishing.  The Villas were marketed as being extremely unique as each would have its own specialized glass showcase with unique Arnold Palmer golf memorabilia.

21.     On or about the evening of June 7, 2008, NBSC and the Developer hosted a private concert, featuring Kenny G, at the Diana Wortham Theater in Buncombe County,

16

North Carolina, for consumers who purchased lots at Seven Falls. Consumers who attended this event were given autographed Kenny G CDs. In or about October of 2008, NBSC and the Developer hosted another promotional event at Seven Falls that featured the Little River Band. The purpose of this event was to coax consumers into buying lots or Villas at Seven Falls. Consumers were given picnic baskets, bottles of wine, and folding chairs to enjoy an outdoor concert on the green. Plaintiff(s) attended some or all of the functions, and were then induced into applying for and purchasing certain lots within the subdivision.

22. At or near the same time of this aggressive marketing, NBSC cancelled nearly Sixty-Three Million Dollars ($63,000,000.00) of its publicly-recorded financial commitment to Seven Falls. NBSC never informed any investors of this cancellation. Upon information and belief, these notes were not due and payable to the bank for at least two years and as long as twenty years later. NBSC took this action for three reasons: 1) it never intended to fully fund 7 Falls the $90,000,000.00 because it expected the rapid growth in the real estate market to lead to the sale of the development to a third-party prior to having to fund the development; 2) the bank was focused on short-term profits and expected that lot purchasers and/or the developer would refinance with a third-party lender prior to having to implement these funds; and 3)NBSC preferred to take TARP benefits from the federal government instead of ensuring that these funds went to the benefit of Seven Falls. Accordingly, in October of 2008, NBSC filed an application to the federal government for TARP funds. In December, 2008, NBSC received approximately Nine-Hundred Sixty Million Dollars ($960,000,000.00) in TARP funds, but applied none of these funds to Seven Falls.

23. A majority of consumers who purchased lots at Seven Falls, including Defendant, financed their lots at Seven Falls through NBSC because of NBSC's aggressive

marketing and aggressive lending practices. The aggressive lending practices include, but are not limited to: a. an atypical lending package to consumers designed to manipulate and inspire Defendant's confidence in an investment at Seven Falls by providing for one hundred percent (100%) of the amount necessary to purchase a lot at Seven Falls, one hundred percent (100%) of the amount necessary to purchase a golf/sports club membership at Seven Falls; one hundred percent (100%) of the amount necessary to pay interest on the lot purchase for two years; and, in some instances, cash at closing; and b. interest only loans for one, two, three, or five years. NBSC persisted in this scheme even though it knew it was not sustainable in order to maximize short-term financial growth. The bank was attempting to grow rapidly by making loans that were of low quality in order to get the $3,472,674.13 in release fees outlined in paragraph 8 and to charge borrowers a premium yield on the balance. The bank undertook the risk associated with lending money to unqualified investors because the bank was profiting from each transaction in the short-run and able to increase its short term profitability on its financial statements. This is evidenced by the statements of Synovus Bank's Chief Executive Officer and Chairman of the Board, Richard E. Anthony, who stated in the Bank's 2006 Annual Report that, "[w]e are fortunate to operate in a healthy region of the country. The Southeast has an excellent business climate, with population growth above national averages. We continued to focus on lucrative markets in this region in 2006." SYNOVUS BANK, 2006 ANNUAL REPORT 7 (2007). Mr. Anthony began his letter to shareholders in the Bank's 2006 Annual Report with the following:

> [o]ur company has enjoyed a long history of strong financial performance, but 2006 stands out as one of our very best years, with powerful results. Diluted earnings per share was $1.90, 16% higher than the previous year, and our return on assets was an exceptional 2.07%. . . . While earning record profits in 2006, we were still able to reinvest in expansion within our existing footprint.
> Id. at 1. This increase in earnings per share was due in large measure to the issuance

of short term loans. Mr. Anthony further stated that, "[c]oming into 2006, we positioned our balance sheet to benefit from higher short-term interest rates. For a majority of the year, our net interest margin was strengthened by the Federal Reserve's actions." Clearly, the Bank's strategy was to maximize its short term profits by taking advantage of this interest margin and its ability to pass on high short term interest rates to borrowers. The Bank was attempting to take advantage of the rapid increase in inflation adjusted real estate prices that occurred in the United States from 2003 through 2007, which time period has been widely described as a real estate boom (the "Real Estate Boom"), by rapidly increasing the number of loans that it made to borrowers to increase its short term profitability through the collection of interest payments and fees. The Bank employed this strategy at Seven Falls by issuing numerous short term, high interest rate loans to lot purchasers. For example, the Bank issued Counterclaimant Thomas Ballas a two year interest only loan in 2008 with an annual percentage rate of 7.68% with guaranteed interest payments of $51,750.00, which increased the Bank's short term income and profitability on its balance sheet. Synovus Bank disregarded the substantial long-term risk to its business from this practice because it believed that rapid real estate price appreciation would continue to occur in the short term and thus provide a market that would yield a third-party purchaser to buy the lot with funds from a third-party lender or market conditions would allow the refinance of the Lot with funds from a third party lender. This was ultimately not the result of course, as the real estate market collapsed and the National Bank of South Carolina failed.

24. NBSC loan officers and other bank officials employed by NBSC were encouraged by NBSC to issue loans to purchasers of lots at Seven Falls. Some of these employees were rewarded for such efforts by receiving all expenses paid trips to the Caribbean. NBSC and its officers and employees/agents benefitted from the development

scheme as follows: Shortly after the sale of a lot to each purchaser, NBSC funded a "deposit account" to provide two years of interest payments in the name of each Seven Falls investor. NBSC officers and employees received bonuses in the form of a percentage of these "deposits." NBSC corporate and Synovus counted these interest payments as income on bank income statements, which increased the price of Synovus's publicly traded stock and the value of any stock options. This increase in the stock price yielded profits to NBSC.

25. NBSC further issued a covenant to Defendant, it failed to fulfill. The covenant read: "We pledge to serve every customer with the highest levels of sincerity, fairness, courtesy, respect and gratitude, delivered with unparalleled responsiveness, expertise, efficiency and accuracy. We are in business to create lasting relationships, and we will treat our customers like we want to be treated. We will offer the finest personal service and products delivered by caring team members who take 100% responsibility for meeting the needs of each customer."

26. NBSC greatly increased the risk of an investment in Seven Falls by failing to comply with its own internal lending standards in at least the following ways:

a.  failing to perform appropriate due diligence to ensure the Developer had appropriate experience, competence and capitalization despite having a right in some measure to direct the conduct of the Developer;

b.  failing to properly make inspections at Seven Falls regarding the progress of construction on a regular basis, including when construction draws were requested by the Developer.

27. Despite NBSC's failure to inspect the progress of construction at Seven Falls, NBSC continued to approve and finance construction draws requested by the Developer and NBSC continued to provide Developer with Defendant's investment dollars

with little or no regard for the use of these funds. In the Spring/Summer of 2008, NBSC demanded the Developer to pay a five million dollar curtailment on the loan between NBSC and the Developer. Upon information and belief, the purpose of this cash injection was to give the perception that the loans to Seven Falls investors complied with federal lending laws. NBSC never disclosed to any of the lot owners at Seven Falls, including Defendant, that it had required this curtailment.

28. As the lack of any construction progress at Seven Falls came to be known by Defendant, NBSC offered to refinance loans that it had with some Defendant in relation to the lots they owned at Seven Falls. In the course of its refinancing negotiations, NBSC never informed Defendant that a curtailment had been required of the Developer. NBSC has assured lot owners that development at Seven Falls will be completed, even if NBSC has to hire a new Developer to complete construction of amenities promised at Seven Falls; yet, to date, NBSC has done nothing to progress the development of Seven Falls.

29. NBSC executives also made statements indicating that NBSC and Developer were joint venturers and that Seven Falls was a "good investment" or "great investment." Specifically, from approximately September 2007 to December 2007, Kin Britton and Donna Brewer (NBSC executives) represented to Tom Ballas over the telephone that NBSC had "partnered with Seven Falls" for the development of the subdivision. Further, NBSC executives sent email correspondence on or about July 2, 2008 to Keith Vinson in which the bank requested from Vinson what "we can expect on net sales proceeds." The "we" indicates shared profits between NBSC and Vinson from the proceeds of lot sales. The representations that 7 Falls was a "great investment" were made as follows: 1) from NBSC executive Kimberly Mode to Farzad Akbar between June 2007 and August 2007 over the phone; 2) from NBSC executives Kin Britton and Donna Brewer to Tom Ballas between

June 2007 and December 2007 over the phone; 3) from NBSC executive Jennifer Cash to John Brooks and Barbara Stevens between June 2007 and August 2007 over the phone; 4) from NBSC executive Jennifer Cash to Markus Frantzen between September 2007 and October 2007 over the phone; 5) from NBSC executive Jennifer Cash to Randy Garvey between November 2007 and December 2007 over the phone (Cash specifically stated to Garvey that his lot would appreciate 25-50% in the two years following the purchase); 6) from NBSC executive Jennifer Cash to Dwayne Dills between May 2007 and July 2007 over the phone; 7) from NBSC executive Jennifer Cash to Emil Hurtak between May 2007 and June 2007 over the phone; 8) from NBSC executive Kimberly Mode to Steve Lucas between June 2008 and July 2008 over the phone; 9) from NBSC executive Jennifer Cash to Kelley Marshall between June 2007 and July 2007 over the phone; 10) from NBSC executive Jennifer Cash to Sherri Martin between June 2007 and December 2007 over the phone; 11) from NBSC executive Jennifer Cash to Bob Shanahan between June 2007 and August 2007 over the phone; 12) from NBSC executive Donna Brewer to Jana Osada between January 2007 and June 2007 at the 7 Falls property.

## CAUSES OF ACTION AS TO PLAINTIFF AND THIRD PARTY DEFENDANTS

### FIRST CAUSE OF ACTION
### (VIOLATION OF 15 U.S.C. § 1703)

30.     Defendant repeats and realleges each and every allegation set forth in the previous paragraphs as if fully set forth herein.

31.     NBSC, its agents and Developer were engaged in the marketing and selling of residential real estate across state lines by use of interstate mail, wires, the internet and other advertising.

32.     NBSC, its agents and Developer marketed Seven Falls together under a

common promotional plan as defined by 15 U.S.C. § 1701(4). The Developments are together considered one subdivision for purposes of the ILSA as the term "subdivision" is defined by 15 U.S.C. § 1701(3).

33. NBSC and Developer are "Developers" as that term is defined by ILSA, because Plaintiff and Third Party Defendants directly or indirectly sold lots at Seven Falls and advertised for sale the lots at Seven Falls. Further, by virtue of the joint venture with Developer, NBSC is a constructive seller of the lots.

34. NBSC and the Developer obtained money and property by means of untrue statements of material fact and by misleading omissions of material fact that were pertinent to purchasing a lot at Seven Falls.

35. Defendant has been damaged by the acts and omissions alleged herein of the Plaintiff and Third Party Defendants.

36. As a result of NBSC and the Developer's violations of ILSA, Defendant is entitled to rescission, damages, attorney fees, costs, independent appraiser fees, pre-judgment interest, travel expenses to and from the lots, and any further and additional equitable relief this Court deems just

37. NBSC and their agents knew or should have known of the requirements of the ILSA.

38. The ILSA is a strict liability statute and the mere violation of not providing Property Reports puts Plaintiff and Third Party Defendants and their agents in violation of the ILSA and entitles Defendant to contract rescission, damages, attorney fees, costs, independent appraiser fees, pre-judgment interest, travel expenses to and from the lots, and any further and additional equitable relief this Court deems just.

39. Additionally, officers, directors and participating planners may be held

individually liable for violations of the ILSA.

40.     The acts and omissions described herein by the officers, directors and planners of Plaintiff and Third Party Defendants subjects them to personal liability under the ILSA.

41.     Defendant has been damaged by the acts and omissions of Plaintiff and Third Party Defendants as alleged herein.

42.     As a result of NBSC and the Developer's violations of ILSA, Defendant is entitled to rescission, damages, attorney fees, costs, independent appraiser fees, pre-judgment interest, travel expenses to and from the lots, and any further and additional equitable relief this Court deems just.

## SECOND CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY AND CONSTRUCTIVE FRAUD)

43.     Defendant repeats and realleges each and every allegation set forth in the previous paragraphs as if fully set forth herein.

44.     Defendant placed special confidence and trust in the hands of NBSC and the Developer based on the representations made throughout the aggressive marketing campaign.  The special trust with NBSC was also based on the investment advice NBSC provided to Defendant.  Specifically, Plaintiff's executive Donna Brewer stated in multiple in person conversations to Defendant Jana Osada between January 2007 and June of 2007 at the Seven Falls property in Henderson, NC that Seven Falls was a "great investment' and that "Osada could not go wrong with her lot purchase."  Further, it appeared from the marketing campaign which was launched by NBSC and the Developer that NBSC was financially backing Seven Falls and was using its name and prestige to generate sales at Seven Falls.

45. Such confidence and trust was justified due to NBSC's experience as a lender and seemingly intricate knowledge of Seven Falls' financial viability.

46. NBSC and Developer have breached their fiduciary duty, and taken advantage of the position of trust and confidence in a manner that has proximately caused damages to Defendant.

## THIRD CAUSE OF ACTION
## (VIOLATION OF N.C. UNFAIR AND DECEPTIVE TRADE PRACTICES ACT)

47. Defendant repeats and realleges each and every allegation set forth in the previous paragraphs as if fully set forth herein.

48. At all relevant times, Plaintiff and Third Party Defendants were engaged in commerce in the states of North Carolina, South Carolina, and Georgia.

49. The sale of lots to consumers, including Defendant, at the Seven Falls subdivision directly affected commerce.

50. Plaintiff and Third Party Defendants' actions and false representations were in or affecting commerce and constitute unfair or deceptive trade practices in accordance with the North Carolina Unfair Trade Practices Act inasmuch as they misled or tended to mislead or deceived or intended to deceive the Defendant. The actions of NBSC specifically affect South Carolina, North Carolina, and Georgia commerce as the executives conveying information to Defendant were stationed in a South Carolina branch of NBSC, and upon information and belief, got direction from executives stationed in a Georgia headquarters for decisions implemented in North Carolina. The unfair or deceptive trade practices happened on a repeated basis and are capable of repetition in the future.

51. Plaintiff and Third Party Defendants' unfair and deceptive trade practices have damaged Defendant and Defendant is entitled to treble damages and attorney fees under the North Carolina Unfair Trade Practices Act.

## FOURTH CAUSE OF ACTION
## (NEGLIGENCE/GROSS NEGLIGENCE OF NBSC)

52.     Defendant repeats and realleges each and every allegation set forth in the previous paragraphs as if fully set forth herein.

53.     NBSC undertook a duty to Defendant by offering Defendant investment advice and additional services.  NBSC further owed Defendant a duty of care arising out of its relationship with the Developer and its intimate knowledge of Seven Falls.  Finally, NBSC undertook the following duty in the customer covenant provided to Defendant: "We pledge to serve every customer with the highest levels of sincerity, fairness, courtesy, respect and gratitude, delivered with unparalleled responsiveness, expertise, efficiency and accuracy.  We are in business to create lasting relationships, and we will treat our customers like we want to be treated.  We will offer the finest personal service and products delivered by caring team members who take 100% responsibility for meeting the needs of each customer."

54.     NBSC breached this duty of care by failing to exercise due care; failing to exercise any care; or by willfully, recklessly, and/or wantonly::

    a.   failing to adequately oversee the Developer and construction project at Seven Falls;

    b.   failing to require appraisals at closings on lots at Seven Falls;

    c.   failing to perform appropriate due diligence to ensure the Developer had appropriate experience, competence and capitalization; and

    d.   failing to properly make inspections at Seven Falls regarding the progress of construction on a regular basis, including when construction draws were requested by the Developer.

    e.   improper loan origination, underwriting and closing procedures;

    f.   violating its own internal procedures by requiring varying and inconsistent

release fees relating to the closing funds of lots sold at Seven Falls;

g.   prematurely    cancelling    approximately    Sixty-Three    Million    Dollars ($63,000,000.00)   of Developer's loan obligations related to Seven Falls and prematurely declaring a loss on the Seven Falls development in order to obtain federal government benefits under the TARP program; and

h.   failing to properly distribute construction `funds` for Seven Falls`.`

55.    As an actual and proximate result of NBSC's breach of the duty owed to Defendant, Defendant has been damaged.

## FIFTH CAUSE OF ACTION
### (NEGLIGENCE/GROSS NEGLIGENCE OF DEVELOPER)

56.    Defendant repeats and realleges each and every allegation set forth in the previous paragraphs as if fully set forth herein.

57.    Developer had a duty to Defendant to use due care in developing the Seven Falls project.

58.    Developer breached this duty failing to exercise due care; failing to exercise any care; or by willfully, recklessly, and/or wantonly:

a.   misrepresenting what amenities, golf course, roads, and utilities would be in the development;

b.   misappropriating Seven Falls development funds; and

c.   manipulating the appraisal process to generate inflated comparison sales.

59.    As an actual and proximate result of Developer's breach of the duty owed to Defendant, Defendant has been damaged. NBSC is vicariously liable for this negligence/gross negligence by virtue of its joint venture relationship with Developer.

## SIXTH CAUSE OF ACTION
### (BREACH OF CONTRACT)

60.     Defendant repeats and realleges each and every allegation set forth in the previous paragraphs as if fully set forth herein.

61.     Defendant entered into a contract (promissory note at issue in this litigation) with NBSC that included the following: "We pledge to serve every customer with the highest levels of sincerity, fairness, courtesy, respect and gratitude, delivered with unparalleled responsiveness, expertise, efficiency and accuracy. We are in business to create lasting relationships, and we will treat our customers like we want to be treated. We will offer the finest personal service and products delivered by caring team members who take 100% responsibility for meeting the needs of each customer."

62.     In 2007 and 2008, Defendant entered into a contract(s) with Developer for the purchase of real property at Seven Falls.

63.     Pursuant to the contract, Developer was obligated to pave private roads with asphalt directly adjacent to Defendant's property; install utility services to Defendant's property; build an 18-hole golf course, golf practice facility, tennis courts, wellness center, swim club, and other amenities.

64.     Very little to none of this construction has taken place and in late 2009 the Developer attempted bankruptcy for Seven Falls, LLC. Developer's breach of contract has proximately caused substantial damages to the Defendant.

65.     By virtue of failing to properly monitor the Developer's use of funds NBSC has breached its agreement with Defendant to serve every customer with the highest levels of sincerity, fairness, courtesy, respect and gratitude, delivered with unparalleled responsiveness, expertise, efficiency and accuracy. We are in business to create lasting relationships, and we will treat our customers like we want to be treated. We will offer the finest personal service and products delivered by caring team members who take 100%

28

responsibility for meeting the needs of each customer.

66.    This breach of contract by NBSC has proximately caused Defendant substantial damages.

67.    As a joint venturer, NBSC is vicariously liable for the breaches of contract by Developer.

**SEVENTH CAUSE OF ACTION**
**(EQUITABLE ESTTOPEL)**

68.    The preceding allegations contained herein are incorporated by reference herein as fully as if restated verbatim.

69.    NBSC and Developer made misleading representations to and concealed material facts from Defendant in order to entice Plaintiff to enter into both the contract to purchase real property in Seven Falls and the promissory note at issue in this litigation.

70.    NBSC and Developer made misleading representations to and concealed material facts from Defendant regarding the development of Seven Falls in order to entice Defendant to execute the promissory note and the real estate purchase agreement.

71.    NBSC and Developer made misleading representations to Defendant regarding the development of Seven Falls Subdivision in order to entice Defendant to enter into both the promissory note agreement and the real estate purchase agreement.

72.    NBSC and Developer made said misleading representations to Defendant with regard to the contracts at issue with the intention that Defendant would rely upon said false statements.

73.    NBSC and Developer had knowledge (actual or constructive) that the representations were misleading and that the concealment was detrimental. Defendant did rely on these statements to his detriment.

74.    Therefore, NBSC should be equitably estopped from enforcing both the

promissory note contract and the real estate purchase contract at issue in this litigation.

**CAUSES OF ACTION AS TO BANK DEFENDANTS ONLY**
**FIRST CAUSE OF ACTION**

**(TORTIOUS INTERFERENCE WITH A CONTRACT)**

75.     Defendant repeats and realleges each and every allegation set forth in the previous paragraphs as if fully set forth herein.

76.    As noted herein, Defendant had a valid contract with Developer for the construction of infrastructure and multiple amenities at Seven Falls and NBSC was fully aware of this contract.

77.     NBSC intentionally procured the breach of this contract by failing to properly fund Developer and thereby causing Developer not to perform under the contract. But for this improper interference, the contractual relationship between Developer and Defendant would have continued

78.     NBSC lacked proper justification for this action and caused Defendant resulting damages. Upon information and belief, NBSC purposely caused Developer to breach the contract with Defendant because NBSC believed it would gain more from taking money from the TARP program than it would lose from failing to fund the developer and causing the breach of contract with the Defendant.

**SECOND CAUSE OF ACTION**

**(NEGLIGENT MISREPRESENTATION)**

79.     Defendants repeat and reallege each and every allegation set forth in the previous paragraphs of Complaint as if fully set forth herein.

80.     Agents of NBSC owed a duty to Defendants to convey information accurately and honestly concerning the viability of Seven Falls.

30

81.     Agents of Plaintiff breached this duty by failing to exercise due care and specifically by making false representations to Defendants pertaining to Seven Falls. Specifically, Plaintiff's executive Donna Brewer stated in multiple in person conversations to Defendant Jana Osada between January 2007 and June of 2007 at the Seven Falls property in Henderson, NC that Seven Falls was a "great investment' and that "Osada could not go wrong with her lot purchase."

82.     These false representations were material to the underlying purchase and sale transaction of the subject lots. NBSC failed to fulfill these representations or ensure the Developer used Plaintiff's money to complete the Seven Falls project.

83.     Plaintiff had a pecuniary interest in making the statements.

84.     Defendants justifiably relied upon the agent of Plaintiff's representations and suffered a pecuniary loss as a direct and proximate consequence of that reasonable reliance.

## THIRD CAUSE OF ACTION

## (COMMON LAW FRAUD)

85. Defendants repeat and reallege each and every allegation set forth in the previous paragraphs as if fully set forth herein.

86. The Bank, through its employee Donna Brewer, intentionally and falsely represented and concealed material facts relative to the purchase of the Lot, by doing the following:

(a) misrepresenting in person between January to June 2007 that 7 Falls was a great investment even though it knew that it carried substantial risk;

(b) concealing material facts related to the risk of the investment in 7 Falls; AND

(c) concealing material facts relating to appraisals of several lots for the Bank in 7 Falls subdivision.

87. The Bank, through its employee Donna Brewer reasonably calculated that the

misrepresentations and/or omissions of material facts listed in this Counterclaim, and other misrepresentations and omissions of material facts, would deceive Osada because had he been aware of these misrepresentations and omissions or concealments of material fact, there is no question that he would not have purchased the Lot.

88. The Bank, through its employee Donna Brewer, made the aforementioned misrepresentations and omissions with the intent of deceiving Osada.

89. Osada was deceived by the misrepresentations and omissions or concealments set forth in this Counterclaim.

90. Osada could not discover the truth about the misrepresentations and omissions through the exercise of reasonable diligence.

91. Osada was induced to forego additional investigation of his lot purchase by the Bank's misrepresentations and high pressure sales tactics.

92. The Bank is liable for the action of Donna Brewer because the Bank expressly or impliedly authorized the actions of Donna Brewer.

93. The Bank is liable for the misrepresentations of Donna Brewer because the misrepresentations were committed within the scope of their employment and in furtherance of the Bank's business.

94. The Bank is liable for the misrepresentations of Donna Brewer because the misrepresentations were ratified by the Bank.

95. The Bank proximately and legally caused Osada harm and damages in an amount to be determined at trial through its intentional misrepresentations of material fact upon which it intended that Osada rely, who did in fact reasonably rely on said misrepresentations to his detriment, in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION

**(FRAUD IN THE INDUCEMENT)**

96. Defendants repeat and reallege each and every allegation set forth in the previous paragraphs as if fully set forth herein.

97. The Bank, through its employee Donna Brewer, made false representations or concealed material facts that it had a duty to disclose, relative to the purchase of the Lot, and thereafter failed to do so.

98. The false representations and concealment of material facts by the Bank through its employee Donna Brewer directly relate to the underlying purchase and sale of the Lot.

99. The Bank, through its employee Donna Brewer, made false representations and concealed material facts with the intent to deceive Osada.

100. Osada reasonably relied on these false representations and omissions and acted upon them by borrowing the money to purchase the Lot and entering into the agreement to purchase the Lot.

101. Due to the existence of the fraud, induced by the Bank and to the detriment of Osada, the purchase of the Lot and the loan used to finance the purchase of that Lot lacks mutuality, and is therefore unenforceable against Osada.

102. The Bank is liable for the actions of Donna Brewer because the Bank expressly or impliedly authorized the actions of Donna Brewer.

129. The Bank is liable for the misrepresentations and omissions of material fact of Donna Brewer because the misrepresentations and omissions of material fact were committed within the scope of their employment and in furtherance of the Bank's business.

131. The Bank is liable for the misrepresentations and omissions of materials fact of Donna Brewer because their misrepresentations and omissions of material fact were ratified by the Bank.

133. The Bank proximately and legally caused Osada harm and damages in an amount to be determined at trial through its intentional misrepresentations of material fact upon which it intended that Osada rely, who did in fact reasonably rely on said misrepresentations to his detriment, in an amount to be proved at trial.

## ADDITIONAL CAUSES OF ACTION AGAINST PLAINTIFF AND THIRD PARTY DEFENDANTS

### (VIOLATION OF N.C.G.S. 45-21.38)

134. Defendants repeat and reallege each and every allegation set forth in the previous paragraphs as if fully set forth herein.

135. Plaintiff is seeking a deficiency judgment against Defendants. Plaintiff is a constructive seller of the lot to Defendant and took a purchase money mortgage.

136. To the extent the loan documents and deed of trust fail to include the statutory language required by N.C.G.S. 45-21.38 and Plaintiff obtains a judgment against Defendants for deficiency, Defendants hereby assert a cause of action against Plaintiff and Third Party Defendants for violation of N.C.G.S. 45-21.38 based on failure to state in the note and deed of trust that the instruments were for the purchase of the land described in the deed of trust.

137. In this event, Defendants' damages will be the judgment and Defendants are entitled to have Plaintiff and/or Third Party Defendants pay and/or bear the cost of that judgment. Plaintiff and Third-Party Defendants are both responsible by virtue of the joint venture.

### (APPARENT AGENCY/AGENCY BY ESTOPPEL/ESTOPPEL TO DENY JOINT VENTURE)

138. Defendant repeats and realleges each and every allegation set forth in the previous paragraphs as if fully set forth herein.

34

139.  Plaintiff's participation in the marketing and promotion of Seven Falls by and through its employees constitutes conduct from which it appeared to Defendant that Keith Vinson; Seven Falls, LLC; and all Developer Third-Party Defendants were jointly involved in the Seven Falls project and from which Defendant reasonably believed Keith Vinson; Seven Falls, LLC; and all Developer Third-Party Defendants were agents of Plaintiff.

140.  Based on this conduct, Defendant dealt with Keith Vinson; Seven Falls, LLC; and all Developer Third-Party Defendants in reasonable reliance on this apparent agency relationship to their detriment.  Accordingly, Plaintiff is estopped from denying the joint venture with Keith Vinson; Seven Falls, LLC; and all Developer Third-Party Defendants.

141.  As a result of this agency and joint venture relationship, Plaintiff is liable for the damages caused to Defendant by the torts, breaches of contract, and other violations of statutory and common law committed by Keith Vinson; Seven Falls, LLC; and all Developer Third-Party Defendant.

**WHEREFORE**, Defendant respectfully requests that:

A.  A trial by jury be granted on all issues of fact;

B.  Plaintiff's claims against Defendant be dismissed;

C.  Plaintiff and Third Party Defendants be ordered to pay  actual damages, treble damages, punitive damages if proven by clear and convincing evidence, attorneys fees, and costs;

D.  That Plaintiff be found vicariously liable for any torts, breaches of contract, or other violations of statutory or common law committed by Developer by virtue of Plaintiffs' joint venture relationship with Developer.

E.  Defendant have such additional relief as the Court deems just and proper.

THE WARD LAW FIRM, P.A.
Attorneys for Defendant, Jana M. Osada

35

s/ John E. Rogers, II
John E. Rogers, II, Federal ID #: 35,811
P.O. Box 5663
233 S. Pine Street
Spartanburg, SC 29304
864-591-2366
864-585-3090 (fax)
Email: jrogers@wardfirm.com

December 7, 2011